Bettye Jean GREEN, Martin King, Deborah Lapidus Fisher, Lisa Lapidus Cohen, and Barry Lapidus, Plaintiffs/Appellees,

v.

Carolyn HIGDON, and Main Street Church of Christ, Defendants/Appellants.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Aug. 4, 1993.

Application for Permission to Appeal Denied by Supreme Court Dec. 6, 1993.

Rehearing Denied Feb. 14, 1994.

J. Stanley Rogers, Doyle E. Richardson, Christina Henley Duncan, Rogers, Richardson & Duncan, Robert L. Huskey, Manchester, for defendants/appellants.

George E. Barrett, Barrett, Johnston & Parsley, William L. Harbison, L. Webb Campbell, II, Sherrard & Roe, Nashville, H. Thomas Parsons, Parsons & Nichols, Manchester, for plaintiffs/appellees.

## OPINION

TODD, Presiding Judge.

This is a will contest involving three wills. Pursuant to T.R.C.P. Rule 54.02, the Trial Court entered partial final judgment against the proponent of one of the wills. Said proponent and a beneficiary of said will have appealed.

"Sometime between 1979 and 1983," the deceased, David King, wrote an undated holographic will of which the appellants, Carolyn Higdon, Main Street Church of Christ and others were beneficiaries.

On January 18, 1985, and April 8, 1985, deceased executed witnessed wills revoking previous wills and naming his relatives as principal beneficiaries.

On April 16, 1985, one of the relatives, Melba Lapidus (now deceased), instituted an action as a result of which Ms. Lapidus was designated conservator for deceased. Ms. Lapidus and her co-conservator Harry Barr Gilley, filed a suit in federal court against Mrs. Higdon and her husband seeking to recover money they allegedly obtained from deceased by undue influence. The suit was resolved adversely to the defendants.

David King died on December 3, 1990.

On December 6, 1990, Carolyn Higdon filed in Probate Court a petition to probate the holographic will of deceased, David King.

On December 7, 1990, the captioned plaintiffs filed a "Petition for Probate in Solemn Form," presenting wills allegedly executed by deceased on January 18, 1989, and April 8, 1989.

On January 17, 1991, Carolyn Higdon filed in Probate Court a "Notice of Contest" in respect to instruments dated January 18, 1985, and April 8, 1985, purporting to be wills of deceased.

On January 17, 1991, the Probate Judge signed a "Certificate of Contest" in respect to the holographic will, the January 18, 1985 will and the April 8, 1985, will. The "Certificate" (order) contains the signature of counsel, including counsel for Carolyn Higdon and Main Street Church of Christ.

Thereafter "Contest Bonds" were filed by the plaintiffs and Carolyn Higdon.

On February 7, 1991, Main Street Church of Christ filed in Probate Court a "Bond of Will Contestant and Beneficiary" reading as follows:

WHEREFORE, three Wills in the subject case have been submitted for probate, one being a holographic instrument and undated, the second being dated January 18, 1985 and the third dated April 8, 1985; and wherefore, each of these Wills have been contested by some interested party thereto and the issues join for submission

to Circuit Court as a Will contest; and whereas the Main Street Church of Christ is named as a beneficiary in the April 8, 1985 Will and in the holographic Will, but in differing amounts and is unnamed as a beneficiary in the January 18, 1985 Will and since contest has been raised by some party to each of these Wills, the Main Street Church of Christ joins issue in the proceedings in regard to each of these Wills and submits its bond herewith in the statutory amount of $500.00 as a beneficiary under the holographic Will, as a contestant under the January 18, 1985 Will and as a beneficiary and contestant under the April 8, 1985 Will.

Pursuant thereto, we, the Main Street Church of Christ, principle (sic) and Robert L. Huskey, surety, acknowledge ourselves indebted and bound unto such other parties to this Will contest as the Court would deem appropriate under the facts of this case in regard to each of these three Wills to the degree that same is necessary and appropriate according to the Court to pay any and all costs which the Court should deem appropriate that the Main Street Church of Christ should pay stemming from this action; and upon compliance with any such order of the Court, this obligation shall be void.

Thereafter motions for summary judgments with supporting documents were filed by plaintiffs and defendant, Higdon.

The Church filed no pleading or other document in the Circuit Court will contest until October 22, 1991, when it filed "Response of Main Street Church of Christ to Motion for Summary Judgment," which stated:

COMES NOW, the Main Street Church of Christ, by and through its attorney and for a response to the Summary Judgment Motion would show unto this Honorable Court the following:

I.

Actually, the motion itself addresses itself to Carolyn Higdon and would thereby not appear to require a response from the Main Street Church of Christ; however, since they are part of the litigation, in that a dismissing of the case of Carolyn Higdon would be adverse to its interest, since it also claims under the handwritten Will that the Main Street Church of Christ will proceed to respond.

II.

The Main Street Church of Christ adopts for its response hereto the pleadings and documents filed by attorneys for Carolyn Higdon.

III.

In addition, the Main Street Church of Christ would show that in its Motion for Summary Judgment, the King Petitioners contend that Summary Judgment should be granted because Carolyn Higdon is estopped to contend that Mr. King was incompetent when he executed the two Wills reported by the King Petitioners because in prior litigation, she contended that he was competent at such period. The Main Street Church of Christ would show to the Court that it was not a party to that prior litigation and has not taken such a position and that even if it should be held that Carolyn Higdon for some reason was estopped to claim that position, the Main Street Church of Christ is not estopped to make that contention.

The Circuit Judge filed a memorandum concluding as follows:

It is the integrity of the January 18, 1985 Will which is at issue pursuant to the King Petitioners' Motion for Summary Judgment, not whether the Holographic Will was procured by the undue influence of Carolyn Higdon. If it is concluded that Mr. King did not lack testamentary capacity when he executed the January 18, 1985 Will, and that the January 18, 1985 Will was not procured by the undue influence of the King Petitioners, as a matter of law the Holographic Will is revoked. *See* Tenn. Code Ann. § 32–1–201(1).

Two issues must be resolved in order to rule on the King Petitioners' Motion for Summary Judgment. First, whether there exists a genuine issue for trial as to Mr.

King's alleged lack of testamentary capacity on January 18, 1985. Second, whether the specific facts set forth by Carolyn Higdon show that there is a genuine issue for trial as to the alleged undue influence exerted over Mr. King by the King Petitioners regarding his January 18, 1985 Will.

. . . .

Carolyn Higdon admits that the January 18, 1985 Will was properly executed. Accordingly, pursuant to *Owen*, the burden shifts to her to prove that Mr. King lacked the mental capacity to make a will, and that he was unduly influenced by the King Petitioners. *Id.* . . .

. . . Mr. King's mental capacity has been at issue in prior litigation between these parties. On May 10, 1985, Melba King Lapidus, in her capacity as conservator for Mr. King, filed a lawsuit against Carolyn and Gerald Higdon in the Coffee County Chancery Court. *See Melba King Lapidus, as Conservator for the Person and Estate of David King v. Gerald Higdon, et al,* No. 85–110 (Coffee Co. Chanc. Ct. filed May 10, 1985) (the "State Court Action"). The complaint in the State Court Action alleged, *inter alia,* that Carolyn and Gerald Higdon exercised undue influence over Mr. King. On April 15, 1986, the co-conservators for Mr. King filed an action against Carolyn and Gerald Higdon, and others, in the United States District Court for the Eastern District of Tennessee, Winchester Division (the "District Court"). *See Charles Lapidus, Harry Barr Gilley, Co–Conservators for David King v. Carolyn Higdon, et al,* No. CV–4–86–32 (E.D.Tenn.1988) (the "Federal Court Action"). The State Court action was subsequently removed to the District Court and consolidated with the Federal Court Action (the consolidated cases will hereinafter be referred to collectively as the "Federal Court Action"). The Federal Court Action was tried before the District Court on April 25–28, 1988.

On May 18, 1988, the District Court entered a Memorandum and Order awarding the co-conservators a joint and several judgment against Carolyn and Gerald Higdon in the amount of $709,294.00. $671,-294.00 of this amount was for loans owed by the Higdons to David King, and $38,-000.00 was for monies obtained by the Higdons from David King by virtue of their exertion of undue influence over him. This order was subsequently amended to award the co-conservators $561,426.00 in interest, for a total judgment against the Higdons in the amount of $1,270,720.00.

The affidavit of Carolyn Higdon filed in the present matter contains no information regarding Mr. King's testamentary capacity on January 18, 1985. Rather, her Memorandum references certain parts of the record in the Federal Court Action in an effort to meet her burden to "set forth specific facts showing that there is a genuine issue for trial". Tenn.R.Civ.P. 56.05. Specifically, Mrs. Higdon alleges that the testimony of Dr. Herman J. Kaplan, Mr. King's treating physician, regarding Mr. King's mental capacity during 1984 and 1985 creates an issue for trial as to Mr. King's testamentary capacity on January 18, 1985.

The King Petitioners maintain that, as a matter of law, the issue of Mr. King's mental capacity in 1985 was litigated in the Federal Court Action, and that Mrs. Higdon may not relitigate the issue in the present case. The King Petitioners base their argument on the doctrine of collateral estoppel.

Collateral estoppel operates to bar a second suit between the same parties as to issues which were actually litigated and determined in the former suit. . . .

. . . The co-conservators in the Federal Court Action asserted at trial that Mr. King was unable to manage his business affairs during 1984 and 1985, and that Carolyn Higdon had taken undue advantage of him while he was in this diminished mental state. To support their position, the co-conservators in the Federal Court Action introduced the testimony of Mr. King's treating physician, Dr. Kaplan, who testified that Mr. King suffered from dementia, and that in his opinion Mr. King had been unable to manage his business affairs since April 1984.

In her defense of the allegations of undue influence against her in the Federal Court Action, Mrs. Higdon testified that Mr. King was fully capable of managing his business affairs in 1984 and 1985. In addition, Mrs. Higdon called many witnesses to testify on her behalf on the issue of Mr. King's mental capacity during this period of time. After hearing exhaustive testimony from both sides on the issue of Mr. King's mental condition during 1984 and 1985, the District Court held as follows:

> Dr. Kaplan's testimony is contradicted by the testimony of several witnesses for defendants [including Carolyn Higdon] who carried out real estate transactions with him during that year [prior to April 1985]. Every witness who testified regarding such transactions indicated that David King appeared to be mentally alert and capable of managing his business affairs when the transaction was carried out.... Under the circumstances, I do not find it credible that Mr. King was suffering from dementia and incapable of managing his business affairs during the entire period of April, 1984 through April 9, 1985.

> \* \* \* \* \* \*

> The difficult question, on which the proof is scarce, is the date on which Mr. King became incapable of managing his business affairs. The court finds that that date was January 31, 1985.

> ....

Carolyn Higdon's allegation in this case that Mr. King lacked testamentary capacity when he executed the January 18, 1985 Will directly contradicts her testimony and conduct throughout the Federal Court Action. Indeed, the record in the Federal Court Action is replete with testimony from Carolyn Higdon regarding her position on Mr. King's mental capacity in 1985. Specifically, in her defense of the allegations of undue influence against her in the Federal Court Action, Mrs. Higdon vigorously asserted that Mr. King was in complete control of his mental faculties through April 9, 1985. In addition, Carolyn Higdon called numerous witnesses on

her behalf in the Federal Court Action to testify regarding the issue of Mr. King's mental capacity during this period of time. Based on the doctrine of judicial estoppel, Mrs. Higdon may not take a contrary position in this case in an effort to gain advantage....

The issue of Mr. King's mental capacity in 1985 was litigated in the Federal Court Action and, as a matter of law, Mrs. Higdon may not relitigate the issue in the present case pursuant to the doctrine of collateral estoppel....

... The second issue to be resolved is whether Carolyn Higdon has set forth specific facts showing that there is a genuine issue for trial as to whether Mr. King's January 18, 1985 Will was procured through the undue influence of the King Petitioners. In her answer to the complaint filed by the King Petitioners, Carolyn Higdon admits that the January 18, 1985 Will was properly executed by Mr. King. Accordingly, the burden of proving undue influence regarding this will is on Mrs. Higdon. *See Owen*, 739 S.W.2d [782] at 787; 1 H. Phillips & J. Robinson, *Pritchard on Wills and Administration of Estates* §§ 143, 145 (4th ed. 1983). To survive the King Petitioners' motion for summary judgment, Carolyn Higdon must designate "specific facts showing that there is a genuine issue for trial" regarding the King Petitioners' alleged undue influence of Mr. King. Tenn.R.Civ.P. 56.-05; *Celotex*, 477 U.S. [317] at 324, [106 S.Ct. 2548 at 2553] 91 L.Ed.2d [265] at 274.

The affidavit of Carolyn Higdon in support of her response to the King Petitioners' motion for summary judgment contains three factual allegations related to Melba King Lapidus' alleged undue influence of Mr. King with regard to his execution of the January 18, 1985 Will. First, Carolyn Higdon maintains that when Mrs. Lapidus visited Mr. King prior to September 1984, "he would become agitated, because she would want him to sell his home and move to Nashville." Carolyn Higdon Affidavit, paragraph 9. Second, "[a]fter September 1984, Melba Lapidus started visiting more often.... After each visit,

Mr. King would be very agitated." *Id.* at paragraph 10. Third, Mrs. Lapidus "contacted [Mr. King's] accountant and his banker about his business and increased her efforts to try to get Mr. King to move to Nashville and sell his house in Manchester." *Id.* paragraph 11. The only remaining fact related to the alleged undue influence exercised by the King Petitioners is the testimony of Walden Fraley in the Federal Court Action, who stated that Mr. King allegedly told him, "five to ten years ago," that "I made my money in Manchester, and I am going to leave it in Manchester."

. . . .

. . . However, the Court finds that the specific facts relied upon by Carolyn Higdon to demonstrate "suspicious circumstances," i.e., vague allegations of Mr. King's agitation toward Melba Lapidus and the statement of Mr. Fraley regarding Mr. King's intent "five to ten years ago," are insufficient to withstand a motion for a directed verdict on the issue. . . .

. . . .

Pursuant to the doctrines of collateral estoppel and judicial estoppel, the provisions of Rule 56 of the Tennessee Rules of Civil Procedure, and the interpretation of Rule 56 in the context of a will contest in *Owen v. Stanley,* 739 S.W.2d 782 (Tenn.Ct. App.1987), Carolyn Higdon's affirmative defenses of lack of testamentary capacity and undue influence with regard to Mr. King's January 18, 1985 Will do not present genuine issues for trial. Based upon Mrs. Higdon's sworn assertion that the Holographic Will predates the January 18, 1985 Will, the Holographic Will is revoked as a matter of law and the King Petitioners are entitled to summary judgment against Carolyn Higdon.

On January 7, 1992, judgment was entered as follows:

ORDERED for the reasons set forth in the Court's Findings of Fact and Conclusions of Law, that the King Petitioners' motion for summary judgment against Carolyn Higdon is granted, and her claims are hereby dismissed with prejudice. It is further

ORDERED that there is no just reason for delay, and, pursuant to T.R.C.P. 54.02, the Court directs the entry of this Order as final judgment as to Carolyn Higdon.

Carolyn Higdon moved to alter or amend, and on May 27, 1992, the Trial Court entered an order stating:

In light of the fact that all parties to the present litigation were not before the Court in the federal litigation. It does appear appropriate to strike the language in the conclusion that reads "based upon Mrs. Higdon's sworn assertion that the holographic will predates the January 18, 1985 will, the holographic will is revoked as a matter of law." Leaving the conclusion to read as follows: "Pursuant to the doctrines of collateral estoppel and judicial estoppel, the provisions of Rule 56 of the Tennessee Rules of Civil Procedure, and the interpretation of Rule 56 in the context of a will contest in *Owen v. Stanley,* 739 S.W.2d 782 Tenn. Criminal Court of Appeals 1987", Carolyn Higdon's affirmative defenses lack of testamentary capacity and undue influence with regard to Mr. King's January 18, 1985 will do not present genuine issues for trial. The King petitioners are entitled to summary judgment against Carolyn Higdon.

The Court's decision has no effect on the remaining parties to this action.

Thereafter, on June 1, 1992, the Circuit Court entered the following order:

In this cause the pleadings reflect that with the exception of the Main Street Church of Christ no other beneficiary made an appearance after being duly served with the Summary Judgment Motion of the proponents of the Dave King Wills dated January 18, 1985 and April 8, 1985. The pleadings filed by the Main Street Church of Christ by their counsel in response to the Motion for Summary Judgment rely on the proof tendered by the proponent of the holographic will, Carolyn Higdon. No additional proof has been tendered at any stage of this proceeding by the Main Street Church of Christ in any form whether affidavits, deposition or sworn testimony and counsel for Main

Street Church of Christ stated in open Court that it was the church's position that the holographic will was valid and relied upon the proof introduced by Carolyn Higdon, defendant-contestant.

Taking the entire record introduced by the proponent of the holographic will, Carolyn Higdon, and viewed by the Court from the standpoint of being introduced on behalf of the potential beneficiary, Main Street Church of Christ, the proof appears to be insufficient to present the issue to a jury. The record from prior hearings in federal proceedings is clear that the January 18, 1985 and April 8, 1985 wills were executed after the holographic will and there is no proof to the contrary in the present proceeding and no proof that David King lacked testamentary capacity at least at the time the January 18, 1985 will was executed. The Court is of the opinion that this is a fact question and the Court finds that no proof has been presented by the Main Street Church of Christ that would support its position that the holographic will was the Last Will and Testament of Dave King and therefore the Court respectfully rules there is no issue to present to a jury.

The Motion for Summary Judgment filed on behalf of Plaintiff/Proponents, Betty Jean Green et al is sustained as to the Main Street Church of Christ.

It is seen that the judgment entered on January 7, 1992, granting summary judgment against Carolyn Higdon only was declared a final judgment pursuant to T.R.C.P. Rule 54.02, but that the subsequent judgment, entered on June 1, 1992, sustaining plaintiffs' motion for summary judgment against Main Street Church of Christ was not declared final pursuant to T.R.C.P. Rule 54.02.

As will be discussed later, it was not proper to render a judgment against a party in a will contest, the proper judgment being for or against the will, or whether or not a valid will was made by the deceased. A judgment against the proponent of a will could be interpreted as a judgment against the will.

The judgment from which this appeal is prosecuted is not a final, appealable judgment because no disposition is made of the April 8, 1985, will. *See* T.R.C.P. Rule 54.02 and T.R.A.P. Rule (3)(a). It is debatable as to whether the partial judgment against the holographic will was properly declared final. Nevertheless, in view of the advanced stage of this appeal, the issues will be considered and resolved as upon extraordinary appeal.

On appeal, Carolyn Higdon presents issues in the following form:

I. The Trial Court erred in granting summary judgment against Carolyn Higdon on the issue of undue influence.

II. The Trial Court erroneously held that Carolyn Higdon is collaterally estopped from asserting that David King lacked testamentary capacity on January 18, 1985 and April 8, 1985.

III. The Trial Court erroneously held that Carolyn Higdon is judicially estopped from asserting that David King lacked testamentary capacity on January 18, 1985, and April 8, 1985.

The Church presents issues in the following form:

(1) Did the Honorable Circuit Judge commit reversible error by granting Summary Judgment in favor of the Lapidus Group against the Main Street Church of Christ?

a. Was granting a Summary Judgment appropriate when no Motion for same had been made?

b. Is evidence present in the record which presents a genuine issue as to any material fact supporting the position of the Main Street Church of Christ?

(2) If Carolyn Higdon is barred by collateral estoppel, judicial estoppel, or res judicata from challenging Mr. King's testamentary capacity on January 18, 1985, and on April 8, 1985, because of previously having judicially taking a position to the contrary, would her actions also bar the Main Street Church of Christ from challenging his testamentary capacity on those dates?

(3) If Carolyn Higdon is barred by collateral estoppel or judicial estoppel, would

not also the Lapidus Group be estopped from contending he was competent on January 18, 1985, and on April 8, 1985, by the prior judicial contentions made by Melba Lapidus that he was incompetent on those dates?

Before considering the issues it is necessary to clarify the nature of proceedings to probate wills, including will contests.

■ The probate and contest of wills are basically statutory rights and statutory proceedings, derived not from common law, but from the ecclesiastical courts of England. A will contest is a proceeding *in rem*, being the estate of deceased. *Petty v. Call*, Tenn.1980, 599 S.W.2d 791, and authorities cited therein.

■ A proceeding for probate is not an action between parties, but an action *in rem* involving the distribution of the *res*. *Fransioli v. Podesta*, 175 Tenn. 340, 134 S.W.2d 162 (1939).

In a stricter sense, the *res* in a will contest is the will of the deceased, rather than the nature and extent of the property of the deceased or the identity of the beneficiaries, both of which are subject to determination in a separate proceeding.

■ The probate of a will is a proceeding *in rem* and operates upon the subject matter. *Reaves v. Hager*, 101 Tenn. 712, 50 S.W. 760 (1899). It is binding on all interested parties whether they were parties to the record or not. *Martin v. Stovall*, 103 Tenn. 1, 52 S.W. 296, 48 L.R.A. 130.

The right of an executrix to take under a will was not an issue before the court determining the right to probate, and was more properly suited to litigation in another proceeding. *Price v. Price*, 37 Tenn.App. 690, 269 S.W.2d 920 (1954).

■ The probate of a will is initiated by its presentation to the Probate Court. It is the duty of the executor named in the will to offer the will for probate. *In Re: Taylor's Estate*, 54 Tenn.App. 173, 388 S.W.2d 657 (1963). However, any person having possession of a will may present it for probate.

■ A contest is initiated in Probate Court by a "petition for contest," in which the contestant is the petitioner, or plaintiff, and all other interested parties are proper defendants. When the Probate Court is satisfied that the contestant has standing to contest and has given security for costs, the contest is certified to the Circuit Court. T.C.A. 32–4–101.

The contest in Circuit Court should not be upon the issues made by the petition and answer thereto filed in Probate Court. *Bowman v. Helton*, 7 Tenn.App. 325 (1928).

In Circuit Court, the issues are made up under the direction of the court. T.C.A. § 32–4–104.

No particular form of pleading is required in making up the issue of *devisavit vel non*, for all that is required is that the party propounding the paper shall affirm it to be the testator's will, and the contesting party shall deny it. *Harrison v. Morton*, 32 Tenn. 461 (1852).

The plaintiff, the proponent of the will for probate, has the affirmative of the issue of the due execution of the will. *Puryear v. Reese*, 46 Tenn., 6 Cold. 21 (1868), History of a Lawsuit § 682.

After proof of due execution, there is a presumption of validity and defendant-contestant has the burden of proceeding to disprove due execution and/or prove lack of capacity or other disability. *Thomas v. Hamlin*, 56 Tenn.App. 13, 404 S.W.2d 569 (1964), History of Lawsuit § 694.

■ Several contests involving several wills of the same person may be consolidated for trial. *Williams v. Bridgeford*, 53 Tenn. App. 381, 383 S.W.2d 770 (1964); *Lillard v. Tolliver*, 154 Tenn. 304, 285 S.W. 576 (1926); *Walker v. Verble*, 5 Tenn.Civ.App. (5 Higgins) 651 (1914).

Since the last valid will of deceased controls the disposition of the property mentioned therein, it would be ordinarily proper to determine the validity of the last will before considering the validity of previous wills. However, it appears that the parties and the Trial Court chose to treat the validity of the January 18, 1985, will as determinative of the effectiveness of the prior holographic will. Regardless of the validity or

invalidity of the April 8, 1985, will, if the January 18, 1985, will was valid when made, it revoked the holographic will even though it (the January, 1985 will) might have been subsequently revoked by the April 8, 1985, will.

–Pleadings in Circuit Court–

On May 7, 1991, the relatives filed a complaint which describes the January 18, 1985, and April 8, 1985, wills, but does not assert that either is the last will of deceased. The complaint prays that one or the other be declared to be the last will of deceased.

On June 10, 1991, Carolyn Higdon answered the complaint of the relatives admitting the due execution of the January 18, 1985, and April 8, 1985, wills, but asserting that said wills were products of undue influence or lack of testamentary capacity. The answer also asserts the validity of the holographic will.

On the same date, June 10, 1991, Carolyn Higdon filed her complaint asserting that the holographic will was the last valid will of deceased and praying for its probate as such.

On July 9, 1991, the relatives filed their answer to the Higdon complaint, asserting that the holographic will was obtained by undue influence and that the deceased lacked testamentary capacity to execute the will. Also, the relatives plead that Ms. Higdon was barred from claiming it to be the valid will of deceased under the doctrines of *res judicata* and estoppel as a result of the judgment of the Federal Court in the case of *Lapidus et al v. Higdon, et al.* Also, the answer asserted that the holographic will had been revoked by a subsequent, valid will.

On August 8, 1991, the relatives filed a motion for summary judgment as follows:

Bettye Jean Green, Martin King, Deborah Lapidus Fisher, Lisa Lapidus Cohen, and Barry Lapidus (the "King Petitioners"), pursuant to Rule 56 of the Tennessee Rules of Civil Procedure, move the Court for the entry of summary judgment in their favor against Carolyn Higdon, and against the validity of the undated handwritten document propounded by her. The bases for the motion are:

(1) Carolyn Higdon can raise no genuine issue of material fact as to the validity of the wills propounded by the King Petitioners, either on the basis of undue influence or lack of testamentary capacity; and

(2) As a matter of law, Carolyn Higdon cannot establish that the undated, handwritten document she propounds is the last will of David King.

In support of said motion, the relatives filed the following:

1.  Uncertified copies of the opinions and judgments of the U.S. District Court for the Eastern District of Tennessee in two cases styled *Lapidus, et al v. Higdon, et al.*

2.  Uncertified excerpt from testimony before the Chancery Court of Coffee County, Tennessee in the case of *Lapidus v. Higdon, et al.*

3.  Uncertified excerpt from testimony before the United States District Court at Winchester.

On October 1, 1991, Carolyn Higdon responded to the motion for summary judgment with a brief of law and her affidavit that, from September, 1984, to and including April 9, 1985, deceased was under the dominion and control of Melba Lapidus.

On October 22, 1991, the Main Street Church of Christ filed a response to the motion for summary judgment asserting that it claims under the holographic will, adopting the response of Carolyn Higdon, and denying that estoppel applies to the Church because it was not a party to the litigation asserted in the motion for summary judgment.

–The Narrow Issue–

–Determined by the Trial Court–

The holographic will was propounded by Ms. Higdon and contested by the relatives.

The January 18, 1985, will was propounded by the relatives and contested by Ms. Higdon.

The due execution of the January 18, 1985, will, was proved by the relatives by uncontradicted evidence and the admission of Ms. Higdon.

At this point, the relatives were entitled to summary judgment in favor of the January 18, 1985, will, and against the prior holographic will unless evidence of incapacity or undue influence was produced.

Main Street Church of Christ offered no evidence, but, as stated in its response to the motion for summary judgment, it adopted and relied upon the evidence offered by Carolyn Higdon. For this reason, the evidence against the January 18, 1985, will be considered as having been offered by both appellants, Ms. Higdon and the church.

The only evidence offered by appellants against the January 18, 1985, will was the deposition of Dr. Herman J. Kaplan, given on June 3, 1985, in the Chancery Court conservatorship case. Dr. Kaplan testified that he treated deceased for various physical problems from March 4, 1982, to April 1, 1985, during which he noted no mental problems, that deceased was hospitalized from April 9, 1985, to April 20, 1985, and that his discharge diagnoses included progressive dementia. Dr. Kaplan also testified that the hospital record contains a notation dictated by Dr. Sprofkin on April 14, 1985, that:

> His niece tells me he's been confused for more than a year. On examination he was obviously disoriented. He obviously has an organic mental state. In view of the history, it's likely that he has senile dementia. I don't think he is capable of looking after his own affairs as long as this present mental state detention continues.

Dr. Kaplan then read from the April 12, 1985, hospital record the diagnosis of Dr. Treadway of "Primary Progressive Dementia," and "Patient should be declared incompetent legally and have a conservator appointed to safeguard his interest."

Based upon the foregoing, Dr. Kaplan, a medical doctor, testified:

> A. My conclusion is that he must have had this primary dementia Alzheimer's Disease for some years. The exact number of years, I couldn't be certain of. Based on my observations on him since 1982, I conclude that his inability to handle his business affairs date back at least a year.

No testimony is found that, on January 18, 1985, the deceased lacked testamentary capacity. No evidence is found of any speech or action of deceased from which a jury could properly find such lack of capacity.

■ The law does not require that persons shall be able to dispose of their property with judgment and discretion in order to execute a will; but, it is sufficient that they understand what they are about. *Hammond v. Union Planters National Bank*, 189 Tenn. 93, 222 S.W.2d 377 (1949); *Thomas v. Hamlin*, 56 Tenn.App. 13, 404 S.W.2d 569 (1964).

■ Incapacity to transact business does not necessarily carry with it incapacity to make a will. *Bruster v. Etheridge*, 48 Tenn. App. 267, 345 S.W.2d 692 (1961).

■ The mere fact that a person may have been under judicially appointed guardianship or conservatorship does not constitute per se adjudication that the person lacked mutual capacity to make and execute a valid will. *In Re: Estate of Mayes*, Tenn.App.1992, 843 S.W.2d 418.

■ Less mental capacity is required to make a will than to carry on business transactions generally. *Farmers Union Bank of Henning v. Johnson*, 27 Tenn.App. 342, 181 S.W.2d 369 (1944). From the foregoing, it is clear that the testimony of Dr. Kaplan, quoted above, is not sufficient to justify a finding as a matter of law that the deceased was incompetent to make a will at any time.

This Court finds no evidence in this record to contradict the presumption of testamentary capacity arising from the undisputed fact that the January 18, 1985, will was duly executed.

■ In her contest of the January 18, 1985, will, Ms. Higdon asserted undue influence. In order to overcome the presumption of validity of the January 18, 1985, will, Ms. Higdon was required to produce evidence which qualified under Rule 56.05 to show that the will was the product of undue influence. The only evidence to this effect was the affidavit of Ms. Higdon that:

> ... 10. After September 1984, Melba Lapidus started visiting Dave King more of-

ten. I remember this time period, because it was after the Jewish holidays, Yom Kippur and Rosh Hashanah in September, 1984. She started visiting more often and started to assert more influence on him. After each visit, Mr. King would be very agitated.

11. The communication between Melba Lapidus and Mr. King increased even more around the Jewish holiday, Hanukkah, 1984, which is around the first week in December. I remember during this period and into January, 1985, Melba Lapidus visited Mr. King more and asserted more influence on Mr. King. She contacted his accountant and his banker about his business and increased her efforts to try to get Mr. King to move to Nashville and sell his house in Manchester. Mr. King would tell my husband and me that he did not want to sell his house or move to Nashville. He would say that he had made his money here (Manchester) and all his friends were here and that he did not want to move to Nashville. He also said on these occasions when he was emotionally distraught that he wished he knew what she wanted, and he wished she would leave him alone.

12. The influence by Melba Lapidus on Mr. King was overreaching in nature, because Mr. King would get agitated and emotionally distraught each time she was in Manchester, and he was trying to resist doing what she wanted him to do. Melba Lapidus' influence on Dave King, which was overreaching in nature, continued until April 9, 1985, when she wanted to take him to the doctor, and Mr. King wanted me to take him. Of course, after April 9, 1985, until Mrs. Lapidus' death, Mr. King was substantially under her dominion and control.

The affidavit contained the following statements by Ms. Higdon: "She started visiting more often and started to assert more influence on him;" "[a]fter each visit, Mr. King would be very agitated;" "during this period and into January, 1985, Melba Lapidus visited Mr. King more and asserted more influence on Mr. King;" "[h]e also said on these occasions when he was emotionally distraught that he wished he knew what she

wanted, and he wished she would leave him alone," and "[t]he influence by Melba Lapidus on Mr. King was overreaching in nature, because Mr. King would get agitated and emotionally distraught each time she was in Manchester, and he was trying to resist doing what she wanted him to do." These statements are not admissible evidence under Rule 56.05. They state only unqualified opinion and hearsay. There is no evidence of any specific act committed by Melba Lapidus which could amount to undue influence.

The affidavit of Ms. Higdon does not raise a factual issue as to undue influence.

The form of the judgment does not conform to the nature of the proceeding which, as heretofore stated, is an action *in rem*, the *res* being the validity of a will or wills, and not rights of specific parties to share in the estate of deceased.

The issue of "devisavit vel non" is, "Did he make a will or not." By extension the issue includes, "If he made a will, what is the valid last will and testament of the deceased."

On this issue, the judgment need not be for or against a party, but for or against the propounded will. In the present case, three wills were propounded and duly contested. The validity of the last, April 8, 1985, will, has not been adjudicated. The effect of the judgment of the Trial Court is to uphold the January 18, 1985, will, and to reject the previous holographic will as revoked. The judgment should so state.

Counsel have exhaustively briefed the issues of *res judicata*, judicial estoppel and collateral estoppel. Such principles might properly apply to a will contest where only the interests of a single heir or legatee were affected by the application of the principle. However, where there are several heirs or devisees, the rights of all cannot be justly defeated by a legal principle which is applicable to only one or less than all. Moreover, the right of deceased to dispose of his estate by a valid will should not be denied because of some act not attributable to him.

In the present case, the undated holographic will names ten beneficiaries, including Carolyn Higdon. It would be unjust to invalidate the will as to all beneficiaries be-

cause of some principle applicable only to Carolyn Higdon.

■ The January 18, 1985, will named five legatees. It would be unjust to invalidate the will as to all legatees because of some principle applicable to only one of the legatees. The rights of legatees are several, and the right of an innocent legatee may not be defeated by an act or omission of another legatee. 95 C.J.S. Wills, § 315, p. 133.

No procedure or process is known to this Court whereby a will contest may result in upholding a will as to some but not all beneficiaries, or sustains a contest as to one but not all contestants.

However, this Court does not deem the principles of *res judicata*, collateral estoppel or judicial estoppel to be determinative of this appeal. The issue was and is, "Was the will executed by deceased on January 18, 1985, the valid last will and testament of the deceased?" The uncontroverted evidence shows that it was.

■ The foregoing renders unnecessary any discussion of the contention of the appellant Church that they should not be penalized by principles applicable only to Carolyn Higdon. Ordinarily, the interested parties have only one opportunity to prove or disprove a will. Absent extraordinary circumstances, a final judgment as to the validity of a will is binding upon all interested parties.

It will be recalled that the Trial Court originally based its ruling upon *res judicata* and/or collateral estoppel applicable only to Ms. Higdon, and not to Main Street Church. However, the Trial Court did not adhere to its reliance upon *res judicata* and/or judicial estoppel. In its final pronouncement on June 1, 1992, the Trial Court abandoned the ground of *res judicata* and/or equitable or collateral estoppel applicable only to Carolyn Higdon and reverted to the fundamental issue of whether any evidence contradicted the presumption of testamentary capacity of deceased on January 18, 1985, arising from the proof of due execution of the will on that date. The Trial Court then held that the evidence produced by Carolyn Higdon and adopted by Main Street Church of Christ

was insufficient to rebut the presumption of capacity.

In response to the issues presented by Carolyn Higdon, this Court holds:

I.

There is no evidence to support a finding of undue influence in respect to the January 18, 1985, will.

II. and III.

The issues of collateral and judicial estoppel and *res judicata* are moot, because there is no evidence that, on January 18, 1985, deceased lacked testamentary capacity.

In response to the issues presented by Main Street Church of Christ, this Court holds:

(1) The Trial Court did not err in rendering summary judgment against the holographic will.

(a) The motion for summary judgment against the proponent of the holographic will was a motion for summary judgment against the will.

(b) No evidence is found to support the position of Main Street Church of Christ that the January 18, 1985, will was invalid for lack of testamentary capacity or undue influence.

(2) The rights of Main Street Church of Christ were not prejudiced by collateral or judicial estoppel or *res judicata* because such issues were rendered moot by the failure of any party to produce evidence to contradict the presumption of testamentary capacity from uncontradicted proof of due execution.

(3) The beneficiaries of the holographic will were not estopped to attack the January 18, 1985 will. The argument that plaintiffs should be estopped is likewise rejected.

It should be noted that the previous judicial decisions were upon the issue of the "capacity to manage his affairs," which is not the same as testamentary capacity.

■ The judgment of the Trial Court is modified to declare that all wills executed prior to January 18, 1985, including the will propounded by Carolyn Higdon were re-

voked by a valid will made on that date. Upon remand, the remaining issues of the validity of the April 8, 1985 will, and the ultimate determination of the last will and testament of deceased will remain for resolution.

As modified, the judgment of the Trial Court is affirmed. Costs of this appeal are taxed against the appellants, jointly and severally. The cause is remanded to the Trial Court for further proceedings.

Modified and Affirmed.

LEWIS and KOCH, JJ., concur.